UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

---

IN RE:
WAYNE MARSHALL,                                   Chapter 7
       DEBTOR.                                   Case No. 11-19878-WCH

---

WILLIAM LENTO,
       PLAINTIFF,

v.                                                Adversary Proceeding
                                                  Case No. 12-1027

WAYNE MARSHALL,
       DEFENDANT.

---

**MEMORANDUM OF DECISION**

## I. INTRODUCTION

The matter before me is the "Complaint to Determine Discharge and Objections to Exemptions of Debtor" (the "Complaint") filed by the plaintiff William Lento (the "Plaintiff") against the debtor/defendant Wayne Marshall (the "Debtor"). Seeking a determination that the debt owed to him by the Debtor is excepted from discharge under 11 U.S.C. § 523(a)(4) as having been money obtained by embezzlement, the Plaintiff contends that the Debtor wrongfully appropriated the proceeds of consigned goods, while the Debtor maintains that the relationship between the parties is simply an open account. For the reasons set forth below, I will enter a judgment for the Plaintiff.

## II. BACKGROUND

For ten to twelve years, the Plaintiff has operated under the name Granitos de Brasil as an importer and wholesale supplier of granite and other stone material used in the construction

industry.[1] From 1997 to 2007, the Debtor owned Terra Nova Marble & Granite which was engaged in the business of selling and installing granite and other stone products used in the construction industry.[2] Prior to this case, the parties entered into a consignment agreement dated March 10, 2006 in which the Plaintiff agreed to consign granite and soapstone slabs to the Debtor (the "Consignment Agreement"). The Consignment Agreement identified the Plaintiff as the consignor and the Debtor as the consignee, and it described the consigned property as "granite slabs as described and marked (see attached material list)" (the "Collateral").[3] With respect to ownership of the Collateral, the parties agreed that "title to the consignment [property] shall remain in Consignor until such consignment [property] is sold in severable parts or in whole by Consignee."[4] The Consignment Agreement also provided, *inter alia*:

> **Time of Payment(s) to Consignor.** Consignor will take a weekly inventory, preferably on every Tuesday. After consulting with the consignee and making sure they are in agreement a check will be issued the following Friday. The slabs will be considered sold whenever a deposit is taken or when the material is "tagged" whichever occurs first.[5]
>
> * * *
>
> **Construction.** This Agreement shall be construed and governed according to the laws of the State of Massachusetts. The parties agree that instances or patters of waiver, forbearance, course of dealing, or trade usage shall not affect the right of a party to demand performance of any term or condition of this Agreement.[6]

---

[1] Trans. Apr. 12, 2013 at 4:20-25; 5:1-2.

[2] *Id.* at 30:22-23; 37:2-7.

[3] "Consignment Agreement dated 3/10/06," Agreed Exhibit 1. The "attached material list," however, was not included with Agreed Exhibit 1.

[4] *Id.* ¶ 1.

[5] *Id.* ¶ 4.

[6] *Id.* ¶ 10.

2

      **Waiver.**  The parties agree that instances or patterns of waiver, forbearance, course of dealing, or trade usage shall not affect the right of a party to demand performance of any term or condition of this Agreement."[7]

The Debtor began taking delivery of the Collateral in March 2006,[8] and the Plaintiff sent the Debtor the first invoice for two granite slabs on May 9, 2006.[9]  In the beginning, the parties' business arrangement was successful—the Debtor was able to sell some of the slabs, and he paid the Plaintiff at the time the slabs were sold or within a week thereof.[10]  It was not long, however, before the Debtor fell behind in his payments.  On or about July 12, 2006, Plaintiff instructed the Debtor to "put the brakes on" selling the Collateral after realizing that the Debtor had only paid him for two or three of the items on a $10,000 invoice.[11]  The Plaintiff had proceeded in this manner with other clients who had fallen behind in their payments, instructing them not to sell any more of the stone materials until he was paid in full, proceeding on a "job-by-job" basis.[12]

      Sensing that the situation was "deteriorating"[13] and fearing the Debtor would ultimately fail to pay him,[14] the Plaintiff filed two financing statements with the Corporations Division of the Secretary of the Commonwealth of Massachusetts in accordance with UCC-1, dated July 5, 2006 and August 3, 2006 respectively (collectively, the "Financing Statements").[15]  In the

---

[7] *Id.* ¶ 11.

[8] Trans. Apr. 12, 2013 at 6:12-14.

[9] "Invoice dated 05/09/06," Agreed Exhibit 4.

[10] Trans. Apr. 12, 2013 at 7:1-12.

[11] *Id.* at 10:2-5.

[12] *Id.* at 10:5-8.

[13] *Id.* at 16:25; 17:1.

[14] *Id.* at 13: 25; 14:1-4.

[15] *See* "UCC Filings," Agreed Exhibit 3.

3

Financing Statements, under the section labeled "Debtor's Exact Full Legal Name," the Plaintiff listed "Terra Nova Marble & Granite Corporation," and in accordance with the form's instructions, he left the remaining spaces for the individual's name blank.[16] Under the section labeled "Secured Party's Name," the Plaintiff listed his own, individual name (Lento, William James), and in accordance with the form's instructions, he left the remaining space for the organization's name blank.[17] The Plaintiff provided the addresses of both parties, and under the section labeled "This financing statement covers the following collateral," the Plaintiff wrote "see attached list."[18]

The Plaintiff continued to send the Debtor invoices for the remaining stone slabs from May 2006 through the end of December 2006, and with the exception of a payment of $1,000 in November 2006,[19] the invoices remain unpaid.[20] The Debtor admits that any money he received for the stone slabs listed in the invoices is money he owes the Plaintiff.[21] In December 2006, Plaintiff made several unsuccessful attempts to repossess the stone slabs that remained on the Debtor's premises.[22] The Debtor then ceased communications with the Plaintiff, and the Plaintiff retained counsel.[23]

---

[16] *Id.*

[17] *Id.*

[18] *Id.* The referred to list is "Inventory Attached to the UCC Filings," Agreed Exhibit 2.

[19] Trans. Apr. 12, 2013 at 8:9-16; 35:18-20.

[20] *Id.* at 8:4-8.

[21] *Id.* at 34:19-21.

[22] *See id.* at 10:12-25; 11:1-3; 23:15-25; 24:1-2, 18-23.

[23] *Id.* at 11:4-12.

In a letter dated March 2, 2007, the Plaintiff demanded that the Debtor allow him to reclaim any remaining slabs and that the Debtor pay him $75,000 to cover his outstanding balance.[24] The Plaintiff also informed the Debtor that the letter was intended to be a demand letter pursuant to Mass. Gen. Laws ch. 93A, § 11 for unfair and deceptive business practices.[25] As a result of the demand letter, the Plaintiff was allowed to enter the Debtor's premises and retrieve the remaining twenty-eight stone slabs, whose total value was approximately $112,000.[26]

The Plaintiff subsequently filed a complaint against the Debtor in Barnstable Superior Court alleging, *inter alia*, conversion and violations of Mass. Gen. Laws ch. 93A[27] and seeking actual damages in the amount of $39,000.[28] The Debtor failed to appear,[29] and on July 31, 2007, the court entered a default judgment against the Debtor in the amount of $124,423.47 (actual damages in the amount of $41,474.49, trebled on the count under Mass. Gen. Laws ch. 93A) plus interest and costs (the "Default Judgment").[30] The Default Judgment has yet to be satisfied.[31]

The Debtor filed a Chapter 7 petition and schedules on October 24, 2011. On "Schedule F – Creditors Holding Unsecured Nonpriority Claims," the Debtor listed the Plaintiff as the holder of a claim in the amount of $40,000. He described the claim as having been issued by

---

[24] "Demand Letter of Plaintiff dated 3/2/07," Agreed Exhibit 6.

[25] *Id.*

[26] Trans. Apr. 12, 2013 at 26:15-23.

[27] Complaint ¶ 11. Note that the "Notice of Entry of Judgment," Agreed Exhibit 5 is the only evidence presented concerning the state court proceedings. The parties agreed in their joint pre-trial statement, however, that the Plaintiff filed suit against the Debtor on April 16, 2007 in Barnstable Superior Court. *See* Joint Pre-Trial Statement, Docket No. 49 at 2, ¶ 6.

[28] Trans. Apr. 12, 2013 at 26: 6-14.

[29] *Id.* at 13:7-10.

[30] "Default Judgment entered 7/31/07," Agreed Exhibit 5.

[31] *Id.* at 13:5-6.

Barnstable Superior Court, Docket # BACV2007-00218. On December 22, 2011, Donald Lassman, the Chapter 7 trustee, filed a report of no distribution. On February 7, 2012, I entered an order discharging the Debtor.

On February 3, 2012, the Plaintiff commenced the present adversary proceeding alleging that the Debtor embezzled consignment proceeds and therefore the debt is nondischargeable under 11 U.S.C. § 523(a)(4). On February 13, 2012, the Debtor filed the "Debtor's Answer to Complaint" (the "Answer"). On July 7, 2012, the Plaintiff filed a motion for summary judgment with respect to all counts in the Complaint, and on August 21, 2012, the Debtor filed an opposition. After conducting a hearing on August 24, 2012, I denied the motion for summary judgment. On November 14, 2012, the Debtor filed a motion to dismiss pursuant to Bankruptcy Rule 7012(b), and on November 28, 2012, the Plaintiff filed an opposition. After conducting a hearing on December 21, 2012, I denied the motion to dismiss.

On December 20, 2012, the parties filed a joint pre-trial statement in which the parties agreed to the following facts:

1. The parties executed a "consignment agreement" on or about March 10, 2006.
2. The Plaintiff prepared an overall inventory of the shipped materials.
3. [The Debtor] sold certain slabs of stone that were designated in the inventory.
4. As of April 12, 2007, the Debtor . . . owed a balance to [the] Plaintiff . . . in the amount of $38.210.89 [sic].
5. [The] Plaintiff . . . filed suit against the Debtor . . . in Barnstable Superior Court on April 16, 2007.
6. [The Plaintiff] obtained a default judgment against the [D]ebtor . . . in the amount of $124,423.47 plus interest and costs on or about July 31, 2007.[32]

On April 12, 2013, I conducted a trial on the adversary proceeding. On both direct and cross examination, the Plaintiff insisted that neither the Consignment Agreement nor the parties'

---

[32] Joint Pre-Trial Statement, Docket No. 49 at 2.

6

understanding of their relationship had changed;[33] despite the parties' failure to perform reconciliations every Friday,[34] the parties never entered into any written modifications of the Consignment Agreement,[35] never agreed that the relationship would be an open account relationship,[36] and the Debtor never represented to the Plaintiff that he believed their business dealings were not governed by the Consignment Agreement.[37]  Furthermore, the Debtor admitted that he owed the Plaintiff the money he claimed,[38] and that he had kept the proceeds from the stone slabs to pay other business expenses (such as payroll).[39]  At the conclusion of the trial, I took the matter under advisement.

### III. POSITION OF THE PARTIES

    A. The Plaintiff

The Plaintiff argues that the Default Judgment is nondischargeable under 11 U.S.C. § 523(a)(4), asserting that the Debtor's actions with respect to the Consignment Agreement amounted to embezzlement and that the Plaintiff suffered damages therefrom.  The Plaintiff alleges that the Debtor ignored the Plaintiff's request to stop selling the Collateral, used the proceeds from sales of some of the Collateral to "further his personal and business interests,"[40] and was "repeatedly deceptive in his dealings with [the Plaintiff], including providing false

---

[33] *See e.g.*, Trans. Apr. 12, 2013 at 28:23-25.

[34] *See id.* at 15:3-9; 25:6-10; 29:1-4.

[35] *Id.* at 11:25; 12:1-4.

[36] *Id.* at 12:5-8.

[37] *Id.* at 13:16-19.

[38] *Id.* at 34:19-21.

[39] *Id.* at 34:25; 35:1-12.

[40] Complaint ¶ 8.

7

information regarding alleged measures [the Debtor] was taking to secure payment for [the Plaintiff]."[41]

    B. <u>The Debtor</u>

The Debtor argues that "the parties' actual course of dealing negates the existence of a genuine 'consignment'" because title to the Collateral passed to the Debtor upon its delivery and the Plaintiff is merely an unsecured creditor.[42] The Debtor alleges that the parties' relationship was not a consignment but rather a series of sales on open account because the Plaintiff sold the Debtor raw materials which he watched him transform into "irreversibly manufactured and unique finished products."[43] The Debtor argues that "[t]here were no operative consignment limits"; that is, knowing that the Collateral would not be sold "qua slabs" but would require work to transform them into finished products, "the Plaintiff imposed no slab-use records, nor prepared any running deductions to bill for use on a current basis, but shipped slabs ad [sic] solicited payments on account, not on a 'per slab' basis."[44]

The Debtor asserts that where the Plaintiff supplied the Debtor with raw materials which would be sold primarily as smaller pieces or counters with cut-outs for sinks and then polished and installed, he knew that the industry standard was to receive payment after finishing and installation (as opposed to in the retail yard), and the Plaintiff not only acknowledged this process but waived the terms of the Consignment Agreement with respect to it. The Debtor emphasizes that the Plaintiff's visits to the Debtor's premises were to collect "what the [D]ebtor

---

[41] *Id.* ¶ 9.

[42] Answer ¶ 17.

[43] *Id.* ¶ 18.

[44] *Id.* ¶ 19.

8

had on hand to pay" as opposed to a fixed sum or a "sum based on observed uses."[45] The Debtor takes issue with the fact that the Plaintiff did not employ "'use' billing—the fundamental condition of a 'consignment,'" and that the Plaintiff's collections were instead based exclusively on funds that the Debtor previously collected.[46] The Debtor also raises the defense of estoppel, arguing that the Plaintiff cannot be surprised by the final debt owed by the Debtor because the Plaintiff continued to supply him according to their credit terms.

The Debtor contends that if the Plaintiff does have a security interest, the collateral is limited to the raw granite slabs left on the Debtor's premises. He asserts that the Plaintiff had notice of the Debtor ceasing operations two years prior to the adversary proceeding, but that he made no effort to claim a "consignment interest" and therefore waived his recovery of any remaining stone slabs left at the Debtor's premises.[47] He argues that where the Debtor's business premises and the stone slabs were seized by the Debtor's landlord two years prior to this case, the "[P]laintiff's train has long since left the Debtor's station, and the [P]laintiff is not entitled to relief."[48]

Finally, the Debtor asserts that where the Plaintiff made no attempt to perfect his security interest, he cannot assert a lien superior to those of other creditors or the Chapter 7 trustee as a hypothetical lien creditor. The Debtor contends that because the Plaintiff did not have a security interest and did not impose "any operating restrictions on the conversion of [the P]laintiff's product (raw slabs) into finished goods," but instead "permitted the Debtor to use the seller's raw materials at [the] Debtor's entire election," the Plaintiff did not retain title to the

---

[45] *Id.* ¶ 18.

[46] *Id.* ¶ 21.

[47] *Id.* ¶ 20.

[48] *Id.* ¶ 22.

9

stone slabs, and therefore he has no basis to allege embezzlement.[49] The Debtor also argues that the Plaintiff is not entitled to the relief sought because the Plaintiff failed to allege that the Debtor acted with malicious or fraudulent intent to "defeat the consignment" and that he made an effort to repossess the materials.[50]

## IV. DISCUSSION

### A. Collateral Estoppel

It is worth addressing at the outset the effect, if any, of the Default Judgment on the proceedings at hand. In *McHeffey v. Pereira*, I explained the principle of collateral estoppel and specifically the effect of prior state court default judgments on dischargeability proceedings in bankruptcy:

> "The principle of collateral estoppel, or issue preclusion, bars relitigation of any factual or legal issue that was actually decided in previous litigation 'between the parties, whether on the same or a different claim.'" In determining whether a party should be estopped from re-litigating an issue decided in a prior state court action, the bankruptcy court must look at that state's law of collateral estoppel. Under Massachusetts law, in order for collateral estoppel to apply, a court must determine that: (1) there was a valid and final judgment on the merits; (2) the party against whom estoppel is asserted was a party (or in privity with a party) to the prior litigation; (3) the issue in the prior adjudication is identical to the issue in the current litigation; and (4) the issue in the prior litigation was essential to the earlier judgment. The doctrine of collateral estoppel applies in dischargeability proceedings in bankruptcy. The "'guiding principle' in determining whether to allow a party the use of collateral estoppel is whether the party against whom it is asserted had a 'full and fair opportunity to litigate the issue in the first action or whether other circumstances justify affording him an opportunity to relitigate the issue.'"

\* \* \*

> It is within a court's discretion to apply collateral estoppel to a default judgment. In Massachusetts, however, default judgments are generally not given collateral estoppel effect on an issue in a subsequent action because the issues have not been

---

[49] *Id.* ¶ 25.

[50] *Id.* ¶ 26.

10

actually litigated. Other federal courts have found it appropriate to make exceptions to the general rule when the defendant actively or substantially participated in the proceedings prior to the entry of a default judgment or avoided participating in the proceeding as part of a litigation tactic. These courts reason "that if a party was afforded a reasonable opportunity to defend in the prior action but chose not to do so, the party could have reasonably foreseen the consequences of not defending the action and it would be 'undeserved' to give a 'second bite at the apple when he knowingly chose not to defend himself in the first instance.'"[51]

Here, the Default Judgment was issued based upon the Debtor's failure to participate in the state court proceedings, and as such, the issues were not "actually litigated" in state court. The present case is not one in which the exception to the general rule barring preclusive effect of default judgments applies. Accordingly, I find that there has not previously been a judgment on the merits of the Complaint. Additionally, even assuming, *arguendo*, that the current proceeding could fall within one of the exceptions to the general rule, collateral estoppel is still inappropriate because the issue in the state court case (unfair trade practices under Mass. Gen. Laws ch. 93A) is not identical to the issue before me (embezzlement of consignment proceeds). Thus, where there is no final judgment on the merits and no identity of the issues, I conclude that the Default Judgment has no preclusive effect over the present dischargeability proceeding.

    B.  Embezzlement Under 11 U.S.C. § 523(a)(4)

The Plaintiff seeks a determination that the Debtor embezzled consignment proceeds and that the debt is nondischargeable. The Plaintiff relies on 11 U.S.C. § 523(a)(4), which provides that "[a] discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—for . . . embezzlement."[52] The Plaintiff bears the

---

[51] *McHeffey v. Pereira (In re Pereira)*, 428 B.R. 276, 281-282 (Bankr. D. Mass. 2010) (internal footnotes omitted).

[52] 11 U.S.C. § 523(a)(4).

burden of proving that the proceeds "come[] squarely within an exception enumerated in 11 U.S.C. § 523(a) . . . by a preponderance of the evidence."[53]

Unlike fraud or defalcation, "[e]mbezzlement does not require the existence of a fiduciary relationship."[54]  "Embezzlement has been defined 'as the fraudulent appropriation of property of another by a person to whom such property has been entrusted or into whose hands it has lawfully come.'"[55]  In other words,

> [t]o prove embezzlement under [11 U.S.C.] § 523(a)(4), the following three elements must be shown:
>   1. The relevant property was rightfully in the possession of a nonowner;
>   2. The nonowner appropriated the property for a use other than which it was entrusted; and
>   3. The circumstances indicate fraud.[56]

There is no dispute that the Collateral was rightfully in the Debtor's possession (as evidenced by the Consignment Agreement and the parties' testimony), and that the Debtor used the proceeds for a purpose for which they were not entrusted (to pay for general business expenses and operations).  The issues now before me are whether the proceeds were in fact the "property of another," and whether the circumstances indicate that the Debtor appropriated them with fraudulent intent.[57]

---

[53] *Follo v. Morency (In re Morency)*, No. 10-1133, 2013 WL 1342485, at *7 (Bankr. D. Mass. Apr. 2, 2013) (*citing Grogan v. Garner*, 498 U.S. 279, 291 (1995); *Palmacci v. Umpierrez*, 121 F.3d 781, 787 (1st Cir. 1997)).

[54] *Farley v. Romano (In re Romano)*, 353 B.R. 738, 765 (Bankr. D. Mass. 2006) (*citing Chapman v. Pomainville (In re Pomainvile)*, 254 B.R. 699, 704 (Bankr. S.D. Ohio 2000)).

[55] *Id.* (*citing Moore v. United States*, 160 U.S. 268, 269, 16 S. Ct. 294, 40 L. Ed. 422 (1895)); *see also Kopelman & Shatz, Inc. v. Mastrangelo (In re Mastrangelo)*, 34 B.R. 399, 402 (Bankr. D. Mass. 1983).

[56] *Osborne v. Rivela (In re Rivela)*, No. 99-1111-JMD, 2000 WL 33679411, at *5-6 (Bankr. D.N.H. Jan. 4, 2000) (*citing Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1173 (6th Cir. 1996); *TransAmerica Comm. Fin. Corp. v. Littleton (In re Littleton)*, 942 F.2d 551, 555 (9th Cir. 1991)).

[57] *See Freer v. Beetler (In re Beetler)*, 368 B.R. 720, 726-727 (Bankr. C.D. Ill. 2007).

1. Property of Another

The first issue is whether the proceeds from the sale of the Collateral belonged to the Plaintiff. Indeed,

> [b]y definition, before a creditor can make a claim of nondischargeability for embezzlement, she must show that the property allegedly embezzled was her property. *In re Dobek*, 278 B.R. 496, 509-10 (Bankr. N.D. Ill. 2002); *In re Conder*, 196 B.R. 104, 111–12 (Bankr. W.D. Wis. 1995). The creditor's ownership of the funds is what distinguishes an embezzlement from a mere debtor-creditor relationship where the debtor simply uses his own money for purposes other than paying the creditor. *In re Rodriguez*, 2007 WL 543750 *5–6 (Bankr. S.D. Tex. 2007); *In re Ramonat*, 82 B.R. 714, 720 (Bankr. E.D. Pa. 1988); *Matter of Storms*, 28 B.R. 761, 765 (Bankr. E.D.N.C. 1983).[58]

In order to determine ownership of the proceeds, I must first determine the ownership of the Collateral.[59]

The Debtor contends that the Plaintiff had no right to the proceeds generated from the sale of the Collateral because title of the Collateral passed to the Debtor upon delivery. The Debtor argues that although the parties originally created a consignment relationship, it devolved into an open account relationship by virtue of the parties' course of dealing. The Plaintiff holds firm that the parties created and maintained a valid consignment relationship, and therefore, he retained title to the Collateral and the proceeds. Thus, at the heart of the parties' dispute is whether the parties created and maintained a valid consignment relationship.

In a true consignment, the owner of goods (the "consignor") delivers possession to a bailee (the "consignee") who is given the power to sell the goods to customers.[60] The consignor retains title of the goods until they are sold to the ultimate buyer, and then the consignee remits a

---

[58] *Id.*

[59] *See id.*

[60] G. Ray Warner, *Consigned to Confusion: Consignments Under Revised Article 9*, 20-JAN Am. Bankr. Inst. J. 30, 30 (Dec./Jan. 2002).

13

portion of the price to the consignor.[61] The consignee is free to return any unsold goods to the consignor.[62] A true consignment is distinguishable from a sale-or-return transaction, in which title is transferred to a buyer upon delivery but the buyer has a contractual right to return the goods; in a true consignment, there is neither a present sale nor a buyer.[63]

It is clear that the parties intended to create a true consignment relationship, where the Consignment Agreement expressly provides that title to the Collateral remains with the Plaintiff until the goods are sold in whole or in part by the Debtor.[64] Additionally, the fact that the parties' course of dealing differed from the Consignment Agreement did not transform the parties' consignment relationship into an open account relationship. The parties expressly agreed that course of dealing would not affect the right of either party to demand performance under the agreement,[65] and as such, the Plaintiff could enforce his ownership rights in the Collateral at any time. Therefore, because the parties' relationship remained a consignment relationship in which the Plaintiff retained title to the Collateral, the proceeds from their sale became the Plaintiff's property as well.

---

[61] *Id.*; 14 Mass. Prac. § 2.13.

[62] Warner at 30.

[63] *Id.*; *see* Mass. Gen. Law ch. 106, § 9-109 cmt. 6.

[64] Agreed Exhibit 1, ¶ 1. It is worth mentioning that despite his attempts, the Plaintiff failed to property perfect his interest in the Collateral because he only provided the name of the Debtor's corporation on the Financing Statements. *See* Agreed Exhibit 3. While this would have some bearing on the Plaintiff's right to the proceeds as against third parties outside of bankruptcy, or even within bankruptcy when confronted with a trustee's motion for turnover of property of the estate, lack of perfection has no bearing on the Plaintiff's right to proceeds in the context of a nondischargeability claim under 11 U.S.C. § 523(a)(4) on the grounds of embezzlement.

[65] Agreed Exhibit 1, ¶ 11.

2. Fraudulent Intent

The second issue is whether the Debtor had fraudulent intent when he appropriated the consignment proceeds. "Even where a case might imply some form of trust by virtue of a debtor holding funds for another, the debtor's subsequent appropriation of the funds will not amount to an embezzlement absent proof of the debtor's fraudulent intent."[66] In the context of consignments, several courts have found that fraudulent intent may be inferred when the debtor has an affirmative duty to remit sale proceeds to a certain creditor but fails to do so.[67] Such a duty is usually set forth in the parties' consignment agreement, and even if the parties do not "adhere rigidly" to the agreed procedure, it is enough that the debtor knows that he has an affirmative duty at some time to remit funds to a certain creditor.[68] A debtor's use of proceeds for business debts and continued business operations is no defense to embezzlement.[69]

This is the precise situation in which the parties here find themselves. Despite the parties' failure to perform Friday reconciliations per the Consignment Agreement, the Debtor knew that he had a duty to remit the proceeds to the Plaintiff and he failed to do so. At trial, the Debtor admitted that any money he received for the stone slabs listed in the invoices from 2006 was money he owed the Plaintiff, and there is no dispute that he used those funds for his own business expenses and operations. From the evidence before me, I am persuaded that the Debtor intended to defraud the Plaintiff. Therefore, I conclude that the Debtor committed an act of

---

[66] *Va. Comm'n of Game & Fisheries v. Myers (In re Myers)*, 52 B.R. 901, 905 (Bankr. E.D. Va. 1985).

[67] *See Hall v. Blanton (In re Blanton)*, 149 B.R. 393, 394 (Bankr. E.D. Va. 1992); *Moonan v. Bevilacqua (In re Bevilacqua),* 53 B.R. 331, 334 (Bankr. S.D.N.Y. 1985); *Chrysler Credit Corporation v. Freeman (In re Freeman)*, 30 B.R. 704, 708 (Bankr. W.D. La. 1983); *Applegate v. Shuler (In re Shuler)*, 20 B.R. 163 (Bankr. D. Idaho 1982).

[68] *In re Freeman*, 30 B.R. at 708.

[69] *Sandalon v. Cook (In re Cook)*, 141 B.R. 777, 784 (Bankr. M.D. Ga. 1992 (*quoting Nat'l Bank of Commerce of Pine Bluff v. Hoffman (In re Hoffman)*, 70 B.R. 155, 163-164 (Bankr. W.D. Ark. 1986)).

embezzlement against the Plaintiff, rendering the debt nondischargeable under 11 U.S.C. § 523(a)(4).

## V. CONCLUSION

In light of the foregoing, I will enter judgment in favor of the Plaintiff.

    *[signature]*

_____
William C. Hillman
United States Bankruptcy Judge

Dated: June 11, 2013

Counsel Appearing:

    Sean M. Beagan, Medford, MA,
        for William Lento, the Plaintiff
    Richard J. Cohen, Centerville, MA,
        for Wayne Marshall, the Debtor/Defendant